UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VEST SAFETY MEDICAL SERVICES, LLC. | § § § | |
| Plaintiff, | § § | CASE NO: _____ |
| v. | § § § | |
| | § | JURY DEMANDED |
| ARBOR ENVIRONMENTAL, LLC., and ROBERT SHELBY, an individual, | § § § | |
| Defendants. | | |

## INTRODUCTION AND COMPLAINT

Over the past decade, through significant investment, effort and knowledge, Vest Safety Medical Services, LLC. ("Vest"), created a niche market for online respirator clearances to help U.S. employers protect their workforces against hazardous atmospheric elements and comply with regulations set by Occupational Health and Safety Administration ("OSHA"). Today, Vest's online respirator clearance services are offered across America from Vest's computer systems in Houston, Texas, and are steered by valuable proprietary, confidential and trade secret information developed by Vest over the years.

Arbor Environmental, LLC. ("Arbor"), led by Mr. Robert Shelby ("Shelby") (each a "Defendant" and collectively the "Arbor Defendants"), operate a competing respirator clearance service. Unbeknownst to Vest until recently, Arbor's service is also steered by Vest's proprietary, confidential and trade secret information, which Defendants misappropriated by deceptively representing themselves as potential customers so they

1

could discover, gain access to and launch a competing business. Now, to stop Defendants' unlawful conduct and obtain damages, Vest brings this complaint against Defendants, and alleges as follows:

## THE PARTIES

1. Plaintiff Vest Safety Medical Services, LLC. is a Texas limited liability company having a place of business at 2306 Blodgett St., Houston, TX 77004.

2. Upon information and belief, Defendant Arbor Environmental, LLC is a California limited liability with its registered address for service at 27424 Sunnyridge Rd., Palos Verdes Estates, CA 90274.

3. Upon information and belief, Defendant Robert Shelby is a California resident with the address 27424 Sunnyridge Rd., Palos Verdes Estates, CA 90274.

## JURISDICTION & VENUE

4. This Court has subject matter jurisdiction over this action pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*; the Economic Espionage Act, 18 U.S.C. §§ 1832 *et seq*; and the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*.

5. This action is between a citizen of Texas and citizens of California. The amount in controversy exceeds the jurisdictional threshold. This Court thus has diversity and subject matter jurisdiction over this matter under 28 U.S.C. § 1332.

6. This Court has personal jurisdiction over the Arbor Defendants because the Arbor Defendants harmed Vest in this district through unauthorized use and access of Vest's confidential, proprietary and trade secret information, which information resided on computer systems located in this District, knowing such access would cause (and in fact

did cause) damage to Vest within this District and the State of Texas. Furthermore, the Arbor Defendants engaged in meetings and business dealings in this District via videoconference, telephone, or other electronic means with Vest personnel located in this District. The Arbor Defendants also contracted with Vest in this District and consented to jurisdiction and venue in the State of Texas.

7. A substantial part of the acts giving rise to Vest's claims, as detailed herein, occurred in this District. Accordingly, venue is properly within this District in accordance with 28 U.S.C. § 1391(b)(2).

## FACTS AND BACKGROUND

*Vest Pioneered a New Market for Online Respiratory Clearance Over the Past Decade*

8. Thousands of American enterprises require their employees to wear respiratory protection equipment when working in hazardous workplace atmospheres to prevent inhalation of harmful air-born particulates, microorganisms, fumes and the like. OSHA mandates that qualified healthcare providers review medical history forms for each such employee and, based on the outcome of the review, fit the employee with an appropriately designed respirator before wearing the respirator in a hazardous workplace atmosphere. This medical history evaluation process -- today commonly referred to as "respirator clearance" -- was traditionally performed by in-person medical exams, and was therefore expensive and time consuming for employers.

9. The logistical challenges arising from OSHA's regulation for workplace respirators became apparent to Vest's founding member, Dr. Kevin Rittger, in 2010 when he was providing medical direction to a company assisting in clean-up efforts following a

major oil spill in the Gulf of Mexico. As relief workers began to report for duty, each needed respirator clearance. Dr. Rittger began to receive boxes full of medical history forms that required his review. There was no way he could review, by hand, the volume of individuals in the time frame required. Thus, Dr. Rittger set out to create a new, automated and computerized process to assist him in evaluating workers' medical history forms.

10. In creating this new process, Dr. Rittger conducted substantial, in-depth research among leading authorities in the field of occupational health and safety, respirator design and the legal regulations concerning respirator use in the workplace. His efforts included, among other things, design and development of new software and algorithms for evaluating workers' medical histories. Dr. Rittger also invented a new and useful medical evaluation questionnaire ("MEQ") and physician-developed algorithms, which he developed as part of his research effort. From the outset, Dr. Rittger undertook careful and substantial efforts to maintain the confidentiality and secrecy of his work product, including his software systems, algorithms, MEQ and related information.

11. Ultimately, Dr. Rittger's new system and methods for respirator clearance were so effective during the 2010 oil spill cleanup that he formed Vest Safety Medical Services, LLC in 2010 in Houston, Texas for the purpose serving America's enterprises and workforces that include an estimated five million respirator wearers annually. At the time, no market for automated online respirator clearance existed – employers simply had no option other than to conduct, in brute force fashion, in-person medical exams for each potential respirator wearer.

12. Dr. Rittger and Vest's initial development effort required hundreds of

thousands of dollars and significant manhours to research, design and implement. The investments included both time and capital to educate the industry about the benefits of an online automated respirator clearance process. Indeed, when Vest began to offer its online automated respirator clearance process in 2011, limited competing services existed and each relied on a different methodology. Now, after nearly a decade of work, Vest's online respirator clearance process represents the gold standard in an industry created, essentially, by Vest alone.

***Vest's Proprietary, Confidential and Trade Secret Information and Safeguards***

13. Vest's successes in the online respirator clearance industry grew, in significant part, from the proprietary, confidential and trade secret information it created over the years. Today, such information is among Vest's most valuable assets. It enables Vest to efficiently evaluate the medical conditions of potential respirator wearers, via its online client software and associated computer systems, and dramatically reduce the workload of medically clearing workers to use respirators at work.

14. Vest has diligently protected its proprietary, confidentiality and trade secret information over the years. For example, Electronic access restrictions, including various data-encryption technologies, prevent online access by the general online public to Vest's software. Vest only issues login credentials after an initial screening and approval process.

15. Further, during the initial screening, Vest evaluates general information about each applicant, including the applicant's intended use of the software. Provided the applicant is a potential customer, Vest evaluates the payment terms it will extend.

16. Customers must also sign a "services agreement" as part of Vest's approval

process. Vest only approves customers who agree not make copies of the software's contents for any purpose, and not otherwise reproduce, display, or distribute such content. Customers must also promise not to provide third parties with access to the Vest's content under the services agreement.

17.     Still further, Vest includes a Terms of Use link below the user log-in fields of the software, as shown below. The Terms of Use further restrict use of the software's content:



Terms of Use

*…You may not obtain… any materials or information though any means not intentionally made available or provided through the Vest site…*

*Your use of the Vest site does not entitle you to make any authorized use of any protected content…*

*You will use protected content solely for your personal use, and will make no other use of the content without the express written permission of Vest…*

18.     Vest denies access to users that fail to meet its customer approval criteria, do not sign the services agreement, do not input valid login credentials or refuse to comply with the Terms of Use.

***Defendants Pose as Potential Customer to Gain Access and Steal Vest's Confidential Information and Trade Secrets, then Launches a Competing Business***

19. On April 14, 2015, Robert Shelby, a Director of Arbor Environmental, a company in the business of providing onsite respiratory fit testing, expressed interest in Vest's online respirator clearance process. Shelby represented that Abor was currently processing paper exams – a function that it may be interested in outsourcing to Vest's online service. Shelby's request led to an initial demonstration of Vest's online software (a "demo").

20. For the demo, Vest set up a new and unique URL to present its software. The software was password protected, with access reserved to the Vest account executive who provided the demo. No login credentials were issued to Defendants to access Vest's online software on their own.

21. Vest first demonstrated its automated respirator clearance software, processes, methods of operations, and systems to Defendants on May 18, 2015. During the demo, Vest's content was displayed in a "view only" format. At no time did Vest authorize Defendants to access Vest's online software or computer systems for any reason. In addition to the demonstrations, Defendants, posing as a prospective client, deceptively learned more about Vest's processes and modes of operation via email and text chat.

22. Following the demo, Defendants requested a contract for new service, which Vest emailed to Defendants. The service contract included restrictions on Defendants' use of Vest's information, including the following:

> (a) Software Deliverables. Software deliverables are defined as the respirator clearance tool within www.vestmed.com or any URL thereunder…

7

> (c) Copies. [Arbor Environmental, the] **"Client" may not make copies of the Software Deliverables for any purpose**.…
>
> (d) Restrictions. **"Client" may not** (except if expressly authorized to do so elsewhere in this Agreement): (i) **reproduce, publicly display, publicly perform, distribute,** or create derivative works from **the Software Deliverables**; (ii) **provide third parties with access to the Software Deliverables** under a service bureau, time sharing, or other arrangement; or (iii) reverse engineer, decompile, disassemble, or otherwise **attempt to derive or access any of the Software Deliverables' source code and/or human readable embodiment.**

Ex. 1 at §2.

23. Shelby informed Vest that Arbor was "going to pass" on Vests services a few weeks after receiving the contract. Despite Shelby's representations, on information and belief, Defendants later returned to Vest's online software to access its contents but, lacking valid login credentials, could not enter.

24. On July 14, 2015, unbeknownst to Vest, Shelby registered the domain name https://RespiratorMedicalEvaluation.com, for the purpose of offering online respirator clearances. On information and belief, Arbor planned to later use this site in competition with Vest's online system.

25. On November 2, 2016, unbeknownst to Vest, Shelby also registered the domain name www.RespSafety.com, for the purpose of offering online respirator clearances. On information and belief, Arbor planned to later use this site to compete with Vest's online system.

26. After establishing its own competing website, Defendants repeatedly visited VestMed.com in the following months for the purpose of gaining access to Vest's confidential, proprietary and trade secret information. Lacking valid login credentials,

8

Defendants were denied access each visit.

27. On January 13, 2017, Defendants requested that Vest provide a second demo of its online software. Shelby again represented that he, on behalf of Arbor (a potential customer), was interested in outsourcing its respirator clearance process to Vest's online software.

28. Vest demonstrated its software for the second time to Defendants on February 6, 2017. Like the first demo, Vest undertook security measures to protect its information. For example, Vest created a new and unique URL address, password protections, presented contents in view only format and did not issue login credentials or otherwise authorize Defendants to access content within the software for any reason. During the second demo, the Vest account executive again demonstrated the software's electronic security and legal protective measures.

29. On information and belief, a few hours after the second demo concluded, without Vest's knowledge or permission, Defendants visited Vest's online software– this time for purposes of misappropriating Vest's proprietary, confidential and trade secret content. During this visit, Defendants circumvented the security measures on Vest's online software and impermissibly gained access to content on Vest's computer systems. Based on Vest's IP logs and other information and belief, Defendants somehow hacked the software's login security features.

30. Once inside the software, according to Vest's IP logs and other information and belief, Defendants navigated through various pages and interfaces, including the medical evaluation questionnaire, copying their full contents as they went. Defendant's

9

navigated and copied pages in English and Spanish. Defendants also submitted blank forms to generate (and copy) all error messages. The copied MEQ contents and corresponding errors embody Vest's important proprietary, confidential and trade secret information, which is at the heart of its online clearance system.

31. Unbeknownst to Vest until recently, between about August 2018 and August 2019, Defendants' RespSafety.com website went live -- featuring copies of Vest's proprietary, confidential and trade secrets, including Vest's MEQ form and error messages, in English and Spanish languages. RespSaftey.com's layout and design also bears confusing similarity in the look and feel, functionality and overall design as Vest's software, including forms, materials, and processes being sold/licensed/offered by Arbor through RespSafety.com. Indeed, RespSafety.com currently offers the same services as Vest's software in direct competition with Vest. Additionally, Vest found Defendants misappropriated other features of Vest's Website and marketing materials, including its description of services and benefits of the services.

32. Based on Vest's IP logs and other information and belief, only two computers ever accessed the unique URL Vest created for its first and second demos to Defendants. One computer is owned by Vest, from which it conducted the two demos. The other computer belonged to Defendants, which they used to hack in and misappropriate content from Vest's software.

33. As of this filing, Defendants continue to operate competing online respirator clearance services, via RespSafety.com, which prominently features and depends on Vest's MEQ and other proprietary, confidential and trade secret content. According to Vests IP

logs and other information and belief, Shelby obtained such critical content for RespSafety.com by misrepresenting Arbor as a potential customer, then hacking Vest's software to access and steal Vest's restricted content.

34. On information and belief, Defendants misappropriated Vest's proprietary content to gain improper advantages including unauthorized use for Defendant's own commercial benefit. Indeed, RespSafety.com today offers products and services that compete directly with the Vest, and impermissibly utilize proprietary, confidential and trade secret information owned by Vest, which Vest developed over a decade-long effort to pioneer and establish a market for online respirator clearances, as noted above.

35. By misappropriating Vest's confidential, proprietary and trade secret information, Defendants unfairly gained a competitive advantage through improper means, relying on commercial espionage and piracy in lieu of research, development, and investment, then palmed off Vest's intellectual property and sales techniques as its own, causing irreparable commercial damage to Vest.

## **CAUSES OF ACTION**

### **Count 1**
### **Violation of the Computer Fraud and Abuse Act**
### **18 U.S.C. §§ 1030(a)(2)(C) & (a)(4)**

36. Vest incorporates the allegations set forth in the preceding paragraphs.

37. Pursuant to 18 U.S.C. § 1030(a)(2)(C), Defendants intentionally accessed at least one of Vest's computers, which Vest used for interstate and/or foreign commerce or communication, without authorization or by exceeding authorized access to such protected computer, and by obtaining information from such protected computer.

38. Pursuant to 18 U.S.C. § 1030(a)(4), Defendants knowingly, and with intent to defraud Vest, accessed at least one of its protected computers, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to Vest's proprietary, confidential and trade secret information.

39. Each of the computer or system of computers that Defendants accessed, as described above, is used in or affecting interstate commerce and constitutes a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

40. Vest has suffered damage and loss by reason of Defendants' actions, including, without limitation, impairment to the integrity of Vest's data, programs, systems and proprietary, confidential and trade secret information and further including the cost of responding to the offense, conducting a damage assessment, and restoring the data, programs, systems and information, lost revenue, cost incurred such as attorneys' fees and internal manhours and consequential damages, in an amount to be proved at trial, but, in any event, in an amount well over the statutory minimum.

41. Defendants' unlawful access to, misappropriation of and unauthorized use of information residing on Vest's computers has irreparably injured Vest. Unless restrained and enjoined, Defendants' continued access to use and use of Vest's confidential and proprietary information will continue to harm Vest. Vest's remedy at law is not adequate to compensate for such harm. Accordingly, Vest is entitled to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

## Count 2
### Violation of the Economic Espionage Act
### Theft of Trade Secret
### 18 U.S.C. §1832

42. Vest incorporates the allegations set forth in the preceding paragraphs.

43. Vest owns trade secrets protected under 18 U.S.C. §1832. Defendants intended to convert Vest's trade secrets, for Defendants' uses in furtherance of its own economic benefit, and while intending or knowing its actions would injure Vest, knowingly

(1) stole, or without authorization appropriated, took, carried away, or concealed, or by fraud, artifice, or deceptively obtained such information;

(2) without authorization copied, duplicated, downloaded, uploaded, replicated, transmitted, delivered, sent, communicated, or conveyed such information;

(3) received, or possessed such information; knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempted to commit the actions described in paragraphs (1), (2) and (3); or

(5) conspired with one or more other persons to commit the offenses described in paragraphs (1), (2) and (3), and one or more of the Defendants acted to effect the object of such conspiracy.

44. Defendants know the trade secrets it misappropriated belong to Vest and are employed by Vest in its products and services used in and intended for use in interstate and/or foreign commerce.

45. Defendants' actions damaged Vest, irreparably harmed Vest and will continue to damage and irreparably harm Vest unless restrained and enjoined. Vest's remedy at law is inadequate to compensate for such harm, warranting injunctive relief.

## Count 3
### Violation of the Defend Trade Secret Act (DTSA)
### 18 U.S.C. §1836

46. Vest incorporates the allegations set forth in the preceding paragraphs.

47. Vest's confidential and proprietary information secured within its software constitute "trade secrets" under the DTSA. Pursuant to 18 U.S.C. §1836, Defendants misappropriated Vest's trade secrets, which Vest used and intended for use in, interstate commerce by knowingly accessing Vest's computer systems without authority, or exceeding authority, for the purpose of acquiring and exploiting Vest's confidential and proprietary information without authorization, for Defendants' own purposes and commercial gain.

48. Defendants' actions damaged Vest, irreparably harmed Vest and will continue to irreparably harm Vest unless restrained and enjoined. Vest's remedy at law is inadequate to compensate for such harm, warranting injunctive relief.

## Count 4
### Trade Secret Misappropriation
### Texas Uniform Trade Secrets Act (TUTSA)

49. Vest incorporates the allegations set forth in the preceding paragraphs.

50. Vest's confidential and proprietary information constitutes trade secrets under the Texas Uniform Trade Secrets Act, Civil Practice and Remedies Code, Title 6, Chapter 134.002. Defendants misappropriated Vest's trade secret information through improper means, directly from Vest and not from generally available information or from the Defendants' own independent research and efforts, then disclosed and used such information without implied or express consent of Vest.

51. Defendants misappropriations were willful and malicious. Accordingly, Vest is entitled to exemplary damages in an amount to be proven at trial, pursuant to TUTSA § 134A.004. Vest is also entitled to attorneys' fees pursuant to § 134A.005.

52. As a direct and proximate result of Defendants' misappropriation of Vest's trade secrets, Defendants have been unjustly enriched, and Vest has sustained damages in an amount to be proven at trial. Vest has suffered irreparable harm as a result of Defendants' activities, and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, and their officers, agents, and employees, and all other persons acting in concert with them, are enjoined from engaging in any further acts of misappropriation.

## Count 5
### Common-Law Misappropriation (Texas)

53. Vest incorporates the allegations set forth in the preceding paragraphs.

54. Vest created product, including medical evaluation questionnaires, materials and content used in its online respirator clearance process through Vest's extensive time, labor, skill and money. Defendants used that product in competition with the Vest, thereby gaining a special advantage in that competition (i.e., a "free ride") because Defendants were burdened with little or none of the expense incurred by Vest.

55. As a result, Vest has sustained damages in an amount to be proven at trial. Vest has also suffered irreparable harm as a result of Defendants' activities, and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, and their officers, agents, and employees, and all other persons acting in

concert with them, are enjoined from engaging in said unfair competition.

## Count 6
### Conversion (Texas)

56. Vest incorporates the allegations set forth in the preceding paragraphs.

57. Vest owned, possessed, or had the right to immediate possession of property included in its online software, including Vest's proprietary, confidential and trade secret information, such as is embodied by Vest's medical evaluation questionnaires. Such property is personal property, belonging to Vest. Defendants wrongfully exercised dominion or control over such property.

58. Vest suffered injury as a result of Defendants' actions. Defendants' actions will continue to injur Vest unless restrained and enjoined.

## Count 7
### Breach of Contract (Texas)

59. Vest incorporates the allegations set forth in the preceding paragraphs.

60. Defendants agreed not to engage in the unauthorized modification, transmittal, reproduction, distribution, and/or exploitation of content included in Vest's online software. Defendants breached this agreement when they accessed and copied content from the Vest software, for non-personal use to compete unfairly in the marketplace with Vest. Defendants further breached its agreement upon distributing and commercializing content from the Vest software, including via Defendants' websites.

61. As a result of Defendants' breach, Vest has sustained damages in an amount to be proven at trial. Defendants have also suffered irreparable harm that cannot be adequately remedied at law unless Defendants, and their officers, agents, and employees,

and all other persons acting in concert with them, are enjoined from engaging in further unauthorized use of Vest's content. Vest all seeks to recover its attorneys' fees under Chapter 38 of the Texas Civil Practice & Remedies Code and/or the attorney's fee provision of the Terms of Use Defendants accepted by accessing Vest's website.

## SPOILATION OF EVIDENCE

62. Vest incorporates the allegations set forth in the preceding paragraphs.

63. Defendants owe a legal duty to preserve relevant evidence related to the above described activities, including all electronic information, computers and systems, website contents, emails, hard copies of papers and all other electronic and tangible materials and things. Defendant's legal duty includes an obligation to preserve forensically sound and unaltered digital files, images of its storage devices, servers and computer systems.

64. Any alteration, modification, destruction or absence of such information by Defendants shall be in violation Defendants' legal duty to preserve relevant evidence.

65. Vest hereby notifies Defendants it will seek all available remedies for any spoliation of evidence, including an adverse inference instruction to the jury.

## JURY DEMAND

66. Vest demands a trial by jury on all issues.

## ATTORNEYS' FEES

67. Pursuant to Chapters 38 and 134A of the Texas Civil Practices and Remedies Code, Vest has presented its claims to Defendants and seeks to recover its reasonable and necessary attorneys' fees.  Defendants have not paid the just amount owed.

## CONDITIONS PRECEDENT

68. All conditions precedent to the claims asserted in this case, and the relief requested, have been satisfied, waived and/or are deemed to have been satisfied.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing allegations, Vest prays that the Court enter judgement in Vest's favor on its claims against Defendants and award Vest the following:

    (a) A permanent injunction prohibiting the Defendants and their officers, agents, servants, employees, and all persons acting in concert with it and/or them, from directly or indirectly:

        (1) acquiring, using, possessing, disclosing, conveying, or communicating to any person any of Vest's proprietary, confidential, trade secret and other valuable information;

        (2) offering for sale, selling, or conveying to any person any products, systems or services produced, manufactured, or marketed using Vest's proprietary, confidential, trade secret and other valuable information; and

        (3) providing for additional restrictions necessary to protect Vest from the mark likely to result from Defendant's wrongful conduct;

    (b) Actual damages;

    (c) Unjust enrichment;

    (d) Reasonable royalty;

    (e) Defendants' profits;

    (f) Exemplary damages, including punitive and enhanced damages;

    (g) Reasonable attorneys' fees;

    (h) Costs; and

    (i) All other legal and equitable relief to which Vest is entitled.

Dated: March 6, 2020

Respectfully submitted,

PORT BUMGARNER LLP

*/s/ Reid Bumgarner*
J. Reid Bumgarner
Attorney-in-Charge
State Bar No. 24053118
S.D. Tex. Bar No. 631284
6750 West Loop S.
Houston, Texas 77401
Telephone: (713) 678-0673
rbumgarner@portbumgarner.com

Seth E. Jaffe
State Bar No. 24083236
PORT & BUMGARNER LLP
6750 West Loop S.
Houston, Texas 77401
Telephone: (713) 574-8667
sjaffe@portbumgarner.com

THE LAW OFFICE OF SAMUEL D. DAVIS,
PLLC Samuel D. Davis, Esq.
State Bar of Texas No. 24055381
SD Tex. Bar No. 699933
2525 Robinhood Street, Suite 206
Houston, TX 77005
Tel: 713-800-2994
Fax: 281-356-0810
sdavis@samueldavislaw.com

**ATTORNEYS FOR PLAINTIFF VEST SAFETY MEDICAL SERVICES, LLC.**