United States District Court
Southern District of Texas
**ENTERED**
June 17, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| VEST SAFETY MEDICAL SERVICES, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-CV-0812 |
| | § | |
| ARBOR ENVIRONMENTAL, LLC, ET AL., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM AND RECOMMENDATION

This misappropriation of trade secrets case is before the Court on Defendants' Motion for Summary Judgment.[1]  ECF 60.  Having considered the parties' submissions and the law, the Court recommends that the Motion be GRANTED IN PART AND DENIED IN PART.[2]

## I.     Factual and Procedural Background

The facts in this section are undisputed unless otherwise noted. Additional facts are cited as needed in Section III below.

Plaintiff Vest Safety Medical Services, LLC (Vest), a Texas company located in Houston, launched its business in 2010 offering "online respirator clearances" to assist employers in complying with Occupational Health and Safety Administration (OSHA)

---

[1] The District Judge referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. ECF 53.

[2] Vest's Motion for Leave to File Sur-Reply, ECF 68, is GRANTED.

regulations for properly assigning respirators to employees who work in hazardous conditions.  ECF 65 at 9-11.  Vest's respirator clearance process requires employees to answer a medical evaluation questionnaire (MEQ) that includes questions required by OSHA as well as follow-up questions developed by Vest.  *Id.*  Vest's process uses an algorithm for analyzing the MEQ and follow-up answers that allows for completion of the OSHA mandated clearance process without an in-person medical exam.  *Id.*

Defendant Arbor Environmental, LLC, is a California company founded in 2008 in Palos Verdes Estates, California and owned by Defendants Robert Ryan Shelby and Jocelyn Shelby, (collectively Arbor).  Since its inception Arbor has offered a suite of services related to OSHA respirator regulations.  ECF 52-2 at 54-55.  Arbor began investigating the possibility of offering an online respirator clearance service in 2015.  *Id.* In 2019, Arbor launched a website, RespSafety.com, offering an online respirator clearance service for clients who do not need in-person services.  *Id.*; ECF 60 at 9-10.

In April 2015, Vest provided information about its respirator clearance process to Arbor and on May 18, 2015 Vest gave Arbor an on-line demonstration of its process.  ECF 60 at 18; ECF 65 at 15-16; ECF 65-15; ECF 65-12.  After the demonstration, Arbor declined to enter into a contract with Vest that would have allowed Arbor to offer Vest's online respirator clearance process to Arbor's clients.  ECF 60 at 18; ECF 65 at 16.  In July 2015, Jocelyn Shelby created an account with Affordable Safety Training, LLC (AST), a company that did have a contract with Vest authorizing it to offer Vest's respirator clearance process, including Vest's MEQ, to AST's customers.  ECF 60 at 20; ECF 65 at 16-17; ECF 65-14 at 6-8.  After agreeing to AST's terms of use and paying a $27.00 fee,

Jocelyn was given a username and password to AST's website that allowed her to view and download Vest's MEQ and use Vest's respirator clearance process.  *Id.*

A couple years later, in February 2017, Vest gave Arbor another demonstration of its respirator clearance process.  Again, Arbor declined to enter a licensing contract with Vest.  ECF 65 at 22.  On the same day as the demonstration, someone at a computer in California, where Arbor is located, used the credentials that were created to provide the Arbor demonstration to access the landing page for the demonstration on Vest's computers.  ECF 65-4 ¶ 40.

Vest contends that Arbor wrongfully obtained its trade secrets and wrongfully used them to develop Arbor's own website, RespSafety.com, to offer a competing online respirator clearance process.  Vest has sued Arbor (and the Shelbys individually) for Violation of the Computer Fraud and Abuse Act, Violation of the Defend Trade Secret Act (DTSA) and Texas Uniform Trade Secrets Act (TUTSA), Breach of Contract, and Conspiracy.[3]  *See* ECF 31.  Arbor moves for summary judgment on all of Vest's claims.

## II.   Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a

---

[3] The Court previously dismissed with prejudice Vest's claims under the Economic Espionage Act, state common law misappropriation, and conversion.  *See* ECF 20.

reasonable jury to find for the nonmoving party. *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002). If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and must present evidence such as affidavits, depositions, answers to interrogatories, and admissions on file to show "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013). In ruling on a motion for summary judgment the Court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987). However, "[c]onclu[sory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (citation omitted).

## III.    Analysis of Plaintiff's Claims

### A.    Defendants' Evidentiary Objections

As an initial matter, the Court addresses Defendants' objections to the IP logs referred to in Brandon Rittger's Declaration (ECF 65-4) and to the Declaration of Kevin Rittger (ECF 65-3). Defendants challenge the admissibility of the IP logs as summary judgment evidence because the IP logs do not conclusively show that Defendants "hacked"

Vest's computers.  ECF 60 at 24 n.6.  Defendants' argument goes to the weight of the IP logs as evidence not to their admissibility.  In any event, for purposes of summary judgment, the Court has considered the Declaration of Brandon Rittger regarding his review of the IP logs, not on the IP logs themselves.

Defendants argue that the Court should disregard Kevin Rittger's Declaration under the "sham affidavit" rule, asserting that it conflicts with the testimony of Vest's Rule 30(b)(6) corporate representative.  ECF 67 at 14 (citing *Free v. Wal-Mart Louisiana, L.L.C.*, 815 F. App'x 765, 766 (5th Cir. 2020) (explaining that the sham affidavit doctrine prevents a party who has been deposed from introducing an affidavit that contradicts their prior deposition testimony in order to manufacture a fact dispute to defeat summary judgment).  But Kevin Rittger was not deposed and has not given any prior testimony in this case.  ECF 68 at 6.  In addition, Defendants' argument that the deposition testimony is not as detailed and specific as Kevin Rittger's Declaration regarding the components of Vest's respirator clearance process is not the type of factual conflict that warrants exclusion under the sham affidavit rule.

The Court now turns to analysis of Defendants' Motion for Summary Judgment on Plaintiff's claims for conspiracy, breach of contract, violation of the Computer Fraud and Abuse Act, and violation of the Defend Trade Secret Act (DTSA) and Texas Uniform Trade Secrets Act (TUTSA).

### B.    Conspiracy

The elements of a civil conspiracy claim under Texas law are: (1) a combination of

two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuit of the object or course of action; and (5) damages occur as a proximate result. *First United Pentacostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). Civil conspiracy is a theory of derivative liability. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), *reh'g denied* (Sept. 6, 2019). Therefore, proof of an underlying tort is required to show a civil conspiracy. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Vest's conspiracy claim rests on the underlying tort of misappropriation of trade secrets: Vest contends "Robert Shelby and Jocelyn Shelby conspired to misappropriate Vest's trade secrets, including violating [TUTSA and DTSA]" and that "Robert Shelby and Jocelyn Shelby were a member of a combination of two or more persons, who sought to and did accomplish the object of misappropriating Vest's trade secrets, including Vest's MEQ."[4] ECF 31, ¶¶ 67-68. However, Arbor argues that Vest's conspiracy claim is preempted by TUTSA which states:

> (a) Except as provided by Subsection (b), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.

TEX. CIV. PRAC. & REM. CODE § 134A.

---

[4] Vest also argues "a jury could easily conclude that each of the three Defendants worked together to take and copy Vest's trade secrets, knew that the trade secrets were acquired by improper means, and knew that there were restrictions of use on Vest's information that prohibited Arbor from using that information to compete with Vest." ECF 65 at 39. This argument reinforces the Court's interpretation of Vest's conspiracy claim as based on the same facts as its misappropriation of trade secrets claim.

District courts in the Fifth Circuit have fairly consistently applied the rule that TUTSA preempts a claim for conspiracy unless the plaintiff can show the claim is based on facts unrelated to the trade secret misappropriation. *See, e.g., Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, No. CV H-19-2953, 2020 WL 6748049, at *13 (S.D. Tex. Nov. 17, 2020) ("Most district courts in Texas hold that if a plaintiff's tort claim is premised on the same factual allegations as its claim for trade secret misappropriation, the claim is preempted by TUTSA."); *Computer Sci. Corp. v. Tata Consultancy Servs. Ltd.*, No. 3:19-CV-970-X(BH), 2020 WL 2487057, at *8 (N.D. Tex. Feb. 7, 2020), report and recommendation adopted, No. 3:19-CV-00970-X, 2020 WL 1428941 (N.D. Tex. Mar. 24, 2020) (finding conspiracy claim preempted because Plaintiff failed to allege facts independent of the trade secret misappropriation claim); *Arya Risk Mgmt. Sys., Pvt. Ltd. v. Dufossat Cap. Puerto Rico, LLC*, No. CV H-16-3595, 2021 WL 6197360, at *4 (S.D. Tex. Dec. 30, 2021), amended on reconsideration in part sub nom., No. CV H-16-3595, 2022 WL 358251 (S.D. Tex. Feb. 7, 2022) (holding conspiracy claim based on the same facts as the TUTSA claim is preempted); *but see 360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *6 (W.D. Tex. Mar. 2, 2016) (declining to find conspiracy to misappropriate trade secrets was preempted because the "agreement" element of a conspiracy claim is not a shared element of a misappropriation claim under TUTSA).

Neither side cites a Texas case applying TUTSA preemption in the context of a claim for conspiracy to misappropriate trade secrets. However, Vest cites Texas Appellate Court decisions which demonstrate that a conspiracy claim based on trade secret

misappropriation under TUTSA was allowed to proceed to the jury. *See* ECF 43. For example, in *Whitlock v. CSI Risk Mgmt., LLC*, No. 05-19-01297-CV, 2021 WL 1712215, at *1 (Tex. App.—Dallas Apr. 30, 2021, pet. denied), plaintiff CSI obtained a favorable jury verdict on claims against Whitlock, including claims for misappropriation of trade secrets and conspiracy. On appeal, Whitlock argued the verdict on the conspiracy claim failed because the jury erred in finding the underlying tort of misappropriation. The Appellate Court found that sufficient evidence supported the jury's misappropriation findings, and thus affirmed the conspiracy verdict. While the opinion upholds a jury verdict for conspiracy based on trade secret misappropriation, nowhere does it discuss the issue whether TUTSA preempts a conspiracy claim based on trade secret misappropriation.

Likewise, two other cases cited by Vest – *Goldberg v. EMR (USA Holdings) Inc.*, 594 S.W.3d 818 (Tex. App.—Dallas 2020, pet. denied) and *Power Rsch. Inc. v. Lewis*, No. 14-19-00012-CV, 2020 WL 5200913, at *9 (Tex. App.—Houston [14th Dist.] Sept. 1, 2020, pet. denied) – are no more persuasive. In *Goldberg*, plaintiff alleged violations of TUTSA as well as a conspiracy claim, but defendant moved to dismiss all claims pursuant to the Texas Citizens Participation Act. 594 S.W.3d at 823-24. The motion to dismiss was denied for failure to show that the lawsuit related to defendant's exercise of free speech. *Id.* at 832. Again, the opinion lacks any discussion of preemption. Similarly, *Power Rsch. Inc.*, does not address preemption of a conspiracy claim by TUTSA. Although plaintiff sued multiple defendants for violation of TUTSA and conspiracy, the "sole issue" before the appellate court was "whether the trial court erred by granting the [defendants] special appearance[.]" *Power Rsch. Inc.*, 2020 WL 5200913, at *3. These cases present no basis

for this Court to reject the holding of several federal district courts which have addressed the issue directly and held state law conspiracy claims based on the same facts as trade secret misappropriation claims are preempted by TUTSA.

The Court is persuaded by the weight of authority from district courts within the Fifth Circuit, cited above, that Vest's conspiracy claim is preempted by TUTSA. Therefore, the Court RECOMMENDS that Arbor's Motion for Summary Judgment on Vest's conspiracy claim be GRANTED.

### C.    Breach of Contract

The elements of a breach of contract claim under Texas law are "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018); *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Arbor moves for summary judgment on the ground that Vest cannot prove the existence of a valid contract between Vest and Arbor.

The Second Amended Complaint alleges "Defendants entered into two valid enforceable contracts with Vest, the Service Agreement and the Terms of Use Agreement." ECF 31, ¶ 60. Vest has abandoned this allegation and does not argue in its Response to Arbor's Motion for Summary Judgment that it has any oral or written contract with any of the Arbor defendants. *See* ECF 65. Instead, Vest argues that Arbor should be bound by the terms of the Client Service Agreement Vest sent Arbor in 2015, even though it is undisputed that Arbor declined to sign it. *Id.* at 41-42. Vest argues that Arbor should not

be permitted to take advantage of the "worldwide, non-transferable, and non-sublicensable license to use the Software Deliverables" Vest offered through Client Service Agreement without being bound by that Agreement.  ECF 65 at 41.  It is black letter law that a plaintiff cannot succeed on a breach of contract claim absent the existence of a valid contract.  There is no evidence that there has ever been a contract between Vest and Arbor.  Therefore, the Court RECOMMENDS that Defendants' Motion for Summary Judgment on Vest's breach of contract claim be GRANTED.

### D.  Computer Fraud and Abuse Act (CFAA) Violations

Vest asserts a private cause of action pursuant to 18 U.S.C. § 1030(g) for Arbor's alleged violation of the CFAA.[5]  The CFAA prohibits "the unauthorized access to a protected computer for the purposes of obtaining information, causing damage, or perpetrating fraud." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 779 (S.D. Tex. 2010).  The CFAA does not define "unauthorized access," but the Fifth Circuit has found it includes acts by users with no authorization to access a protected computer ("outsider hackers who break into a computer"), as well as those who exceed the scope of their authorized access to a protected computer ("insiders, who are authorized to access a computer.").  *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (citing legislative history).

Count 1 of Vest's Second Amended Complaint alleges that Arbor violated § 1030(a)(2)(C) and (a)(4)[6] of the Act by intentionally accessing Vest's computers without

---

[5] Section 1030(g) provides a private right of action when one of the five factors in subclauses (I)-(V) of § 1030(c)(4)(A)(i) is present. *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 629 (S.D. Tex. 2011).  Vest alleges it has suffered $5,632.00 in losses due to employee time spent investigating the alleged unauthorized access and thus satisfies 18 U.S.C. § 1030(c)(4)(A)(i)(I). ECF 31, ¶ 50; ECF 65 at 40; ECF 65-4, ¶ 41.
[6] Section 1030(2)(c) imposes liability on a person who:

authorization or by exceeding authorized access to Vest's computers and thereby obtaining valuable information from Vest. ECF 31 ¶¶ 45-51. Vest's Second Amended Complaint does not specify the means or dates of the alleged unauthorized access. *See id.* Vest's Response clarifies its CFAA claim by arguing that Arbor violated the CFAA when it used inadvertently revealed log-in credentials (revealed to Robert Shelby during the February 2017 demonstration) to access Vest's computers and obtain valuable information. *See* ECF 65 at 40-41 (citing *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F Supp. 2d 309, 316 (E.D. Va. 2009).

Vest's summary judgment evidence in support of its CFAA claim includes the Declaration of Brandon Rittger, son of Vest's founder and a computer programmer for Vest. ECF 65-4. Brandon Rittger testifies that internal log in credentials were inadvertently displayed on the screen visible to Arbor during the 2017 demonstration. *Id.*, ¶ 35. He further states "I later learned that, without authorization, Arbor used the inadvertently disclosed credentials to access the demonstration account Vest created." *Id.* Brandon Rittger analyzed "Vest's IP logs from 2017 to 2019 and activity associated with the online landing page Vest created for the 2017 demo to Arbor[,]" and "uncovered that

---

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--
    (A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);
    (B) information from any department or agency of the United States; or
    (C) information from any protected computer;
Section 1030(a)(4) imposes liability on a person who:
    (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

Arbor had accessed Vest's system numerous times from 2017 to February 5, 2019, . . . using the credentials Vest had inadvertently displayed in the 2017 demo to Arbor." *Id*., ¶ 39. Rittger's Declaration states that Vest's IP logs prove that on February 6, 2017, someone "located in the city where Defendants work and live accessed Vest's system and viewed, among other things, information shown to Arbor in the Vest demo." *Id*., ¶ 40; *see also* ECF 52-2 at p. 82:12-83:14 (stating in deposition testimony that an IP address in California very close in proximity to Arbor's address accessed the "demo account" that had been created for Arbor).

Accordingly, Vest has presented summary judgment evidence demonstrating a disputed fact issue as to whether Arbor gained unauthorized access to Vest's system on February 6, 2017 and on other occasions from February 2017 through 2019. ECF 65-4, ¶¶ 39-40. A reasonable jury could find that, if Arbor was an unauthorized user who accessed Vest's system, it did so for "the purposes of obtaining information, causing damage, or perpetrating fraud." *M-I LLC v. Stelly*, 733 F. Supp. 2d at 779. For these reasons, the Court RECOMMENDS that Arbor's Motion for Summary Judgment on Vest's CFAA claim be DENIED.

### E.      TUTSA and DTSA Violations

#### 1.      Legal Standards

Vest asserts a claim for misappropriation of trade secrets under both the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001-008 (TUTSA) and the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. (DTSA). ECF 31, ¶¶ 52-58. The elements of a misappropriation of trade secrets claim under either statute are: (1) the

existence of trade secrets; (2) misappropriation; and (3) use.  *StoneCoat of Texas, LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 344 (E.D. Tex. 2019); *M-I L.L.C. v. Q'Max Sols., Inc.*, No. CV H-18-1099, 2019 WL 3565104, at *3 (S.D. Tex. Aug. 6, 2019). Vest bears the burden to prove each element.  *See Trilogy Software, Inc. v. Callidus Software, Inc.,* 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied) (it is the burden of the party claiming trade secret status to prove secrecy).  "Because the definitions of 'trade secret' in the DTSA and TUTSA are functionally identical," the Court considers them together for purposes of summary judgment.[7]  *See* ECF 20 at 9; *StoneCoat of Texas, LLC*, 426 F. Supp. 3d at 333 (finding that TUTSA and DTSA are both based on the Uniform Trade Secrets Act and "therefore, a substantial number of provisions, including the definition of 'trade secret,' are identical or very similar in many respects.");  *M-I L.L.C.*, 2019 WL 3565104, at *3 (considering TUTSA and DTSA claims together because they require proof of the same elements).

TUTSA defines a trade secret as:

[A]ll forms and types of information, including . . . technical . . . information, and any formula, design, . . . compilation, program device, program, code, device, method, technique, process, procedure, . . . whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
>      (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and
>      (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

---

[7] The parties agree it is appropriate to consider the DTSA and TUTSA claims simultaneously.  ECF 60 at 10 n.1; ECF 65 at 23.

Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 134A.002(6).  Recognizing that "it is not possible to state precise criteria for determining the existence of a trade secret," the Texas Supreme Court has identified six non-exclusive factors to consider when determining whether information is entitled to trade secret protection:

> 1. The extent to which the information is known outside the business;
> 2. The extent to which it is known by employees and others involved in the business;
> 3. The extent of measures taken to guard the secrecy of the information;
> 4. The value of the information to the business and to its competitors;
> 5. The amount of effort or money expended in developing the information; and
> 6. The ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003); *M-I L.L.C.*, 2019 WL 3565104, at *4 (citing *GlobeRanger Corporation v. Software AG United States of America, Incorporated*, 836 F.3d 477, 492 (5th Cir. 2016)).  "A key part of the definition of a trade secret is secrecy." *Lawfinders Assocs., Inc. v. Legal Rsch. Ctr., Inc.*, 65 F. Supp. 2d 414, 418 (N.D. Tex. 1998).  "Trade secret protection does not extend to information disclosed to others who have no duty of non-disclosure or duty of confidentiality." *Id.* at 422.  The existence of a trade secret is generally a question of fact for the jury or fact-finder.  *M-I L.L.C.*, 2019 WL 3565104, at *4.

### 2.    Vest's Alleged Trade Secrets

Arbor contends that Vest's respirator clearance process is comprised of (1) Vest's website; (2) Vest's marketing materials; (3) Vest's software, including the algorithm, scoring system, and computer software used to evaluate the MEQ, and (4) Vest's MEQ. ECF 60 at 10, 23.  Based on this assumption, Arbor argues Vest cannot demonstrate the existence of a trade secret because (1) the website and marketing materials are public

14

information; (2) Arbor never viewed or obtained Vest's software, algorithm, or scoring system; and (3) Vest's MEQ is comprised of public OSHA required questions and commonplace follow-up questions. *Id.* at 10-11, 23-27. Arbor's motion for summary judgement also asserts that Vest cannot show that its MEQ meets the 6-factor test for determining the existence of a trade secret under Texas law. *Id.* at 27-33.

Vest argues that its "unified" respirator clearance process, with "Vest's secret MEQ at the core of that process" is a is a combination of public and secret information and that the "unified process" affords Vest a competitive advantage. ECF 65 at 25; *see also* ECF 65 at 24 (arguing that the definition of trade secret "easily encompass Vest's MEQ and Vest's Respirator Clearance Process."). In other words, Vest implicitly recognizes that its website and marketing materials are not trade secrets but argues that because "other elements" of its respirator clearance process remain secret, "the entire unified process is a trade secret." *Id.* at 26.

The Declaration of Dr. Kevin Rittger, the founder of Vest, explains that the online respirator clearance process he developed for Vest is comprised of a series of 9 steps. ECF 65-3. The first step involves presenting a potential respirator user with "unique targeted questions," i.e., Vest's MEQ. *Id.* ¶ 11.1. Steps 2-6 involve applying Dr. Rittger's algorithm for analyzing the potential users MEQ answers to determine approval. *Id.* ¶¶ 11.2-11.6. Steps 7-9 involve implementing any of Steps 1-6 with "software deliverables" accessible over the internet subject to login credentials. *Id.* ¶¶ 11.7-11.9.

Vest does not contend that Arbor copied Vest's algorithm for evaluating the MEQ. *See* ECF 65 at 22, ¶ 45 ("Defendants created an algorithm based directly on Vest's MEQ

which it then had programmed to RespSafety's website . . . ").  Rather, Vest argues Arbor copied Vest's MEQ, one of the "secret" elements of its "unified process," which Vest defines as "a compilation of Vest's over one hundred (100) innovative and unique follow-up questions, which improve upon OSHA's standard MEQ questions," as well as "unique error messages and certain Spanish translations that are not provided by OSHA that increase the quality and usefulness of Vest's MEQ."  ECF 65 at 13-14.  Because Vest asserts a trade secret misappropriation claim for a process based on both public and private information, the Court's analysis of Arbor's motion for summary judgment focuses on whether Vest has raised a disputed issue of fact as to whether the elements of the "unified process" which are alleged to be "secret" meet the requirements of a trade secret.

### 3.   Application of Trade Secret Factors to Vest's MEQ

*The extent to which Vest's MEQ is known outside its business*.   Arbor has submitted evidence that the concept of an online respirator clearance process that incorporates an OSHA-required questionnaire augmented by follow-up questions is widely known and used in the industry. ECF 52-2 at 44-45.  Vest represents that it is unaware of any entity in the industry other than Arbor that possesses or uses Vest's MEQ.  ECF 65-4, ¶¶ 17, 25.  While the concept of an online respirator clearance process based in part on OSHA-mandated questions appears to be widely-known, Arbor has not shown for purposes of summary judgment that Vest's MEQ, in its entirety, is widely known in the industry.

*The extent to which Vest's MEQ is known by employees and others involved in its business*.  Vest has disclosed its MEQ to its employees and licensees.  Vest requires account executives with access to the MEQ to sign confidentiality agreements.  ECF 65-

10.  Vest's licensees, such as AST, are also required to sign confidentiality and restrictive use agreements.  ECF 65-11.  Nothing in the summary judgment record identifies how many employees and licensees have access to Vest's MEQ and Arbor has not demonstrated that Vest disclosed the MEQ in the absence of a restrictive use or confidentiality agreement.

   ***The extent of measures taken to guard the secrecy of Vest's MEQ***.  Vest presented summary judgment evidence demonstrating that it "imposes significant security measures related to access and use of the questions that make up the MEQ and other elements of its Respirator Clearance Process."  ECF 65-4 ¶ 12.  For example, Vest "does not publicly disclose all the elements of its Respirator Clearance Process, nor Vest's MEQ."  *Id*. at ¶ 20.  "Vest maintains its MEQ within its password restricted online portal and actively manages login credentials and controls access to the platform."  *Id*. at ¶ 21.  Users are granted access after agreeing to confidentiality and use restrictions.  *Id*.  In addition, before a client receives access to the online portal, the client must sign Vest's Client Service Agreement which states that the client may not "reproduce, publicly display, publicly perform, distribute or create derivative works from the Software Deliverables."  *Id*. at ¶22.  Vest requires its clients to restrict and limit the use of Vest's online platform by all of client's end users and end users cannot access the platform without password credentials.  *Id*. ¶ 28.  For example, Vest licensee AST required users to agree to Terms and Conditions that restrict the copying and use of Vest's MEQ.  *Id.* ¶ 29; ECF 65-13.  Vest does not disclose the "over one hundred unique MEQ follow up questions" to potential customers or in marketing materials, but rather shows only "miniscule sample[s]" of its MEQ information for illustrative purposes.  *Id*. ¶ 24.

***The value of Vest's MEQ to the business and to its competitors***.  Vest contends that it "has generated over 9.5 million dollars in revenue using Vest's Respirator Clearance Process.  Vest's MEQ is at the heart of Vest's Respirator Clearance Process and business model."  ECF 65-4 ¶ 4.   Vest's expert calculated that Arbor "generated profit on the sale of Vest's specific MEQ in the amount of $887,086" and avoided "millions of dollars in avoided development costs" by copying Vest's MEQ.  ECF 65 at 15n.1; ECF 65-6.   Thus, Vest has presented testimony evidencing that Vest's MEQ has (or had) some value to both Vest and Arbor.

***The amount of effort or money expended in developing Vest's MEQ***.  Brandon Rittger attests in his Declaration that "[f]rom the creation of Vest's MEQ until February 2019, Vest incurred at least $3,099,500 in costs developing Vest's Respirator Clearance Process, including continuous ongoing research and development of its online platform and software, as well as educating the industry about the benefits and acceptability of Vest's online, automated approach."  ECF 65-2, ¶ 5.  Brandon Rittger's Declaration does not segregate the amount of effort or money expended in developing Vest's MEQ versus other aspects of Vest's Respirator Clearance Process.  Moreover, Brandon Rittger testified in his deposition that only a few weeks of time and no outside experts were needed for his father and stepmother to develop the MEQ itself, and it has not been updated since its original creation in 2010.  ECF 52-2 at 70-71.

***The ease or difficulty with which Vest's MEQ could be properly acquired or duplicated by others***.  In support of its motion for summary judgment Arbor has presented evidence that its own consultant developed a unique MEQ for Arbor's use in a matter of

hours and for less than $1,500.00.  ECF 52-2 at 57; ECF 52-2 at 159-73.  This evidence establishes that an independent consultant easily developed a separate MEQ for fairly minimal cost, but does not necessarily establish that *Vest's* MEQ is easily duplicated.

The MEQ is alleged to be only part of a unified process which Vest alleges to be a valuable, not easily-replicated trade secret.  Because the MEQ is the only "secret" part of a process that includes information either available to the public (Vest's website and marketing materials), or not alleged to have been copied (Vest's algorithm), the Court has focused on whether Vest has presented summary judgment evidence demonstrating a disputed issue of fact as to the trade secret status of the MEQ.  The Fifth Circuit has consistently recognized that whether information qualifies as a trade secret is a fact-intensive inquiry usually best left to a jury or fact-finder.  *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) ("The existence of a trade secret is properly considered a question of fact to be decided by the judge or jury as fact-finder." (citation omitted)); *Zoecon Indus., a Div. of Zoecon Corp. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983) (whether alleged trade secret is generally known or readily ascertainable is a question of fact).  Having considered the factors applicable to the trade secret determination, the Court concludes that Vest has presented sufficient evidence to meet its summary judgment burden to identify a genuine issue of material fact as to whether Vest's MEQ qualifies as a trade secret.

**4.    Vest has demonstrated disputed issues of fact on the "misappropriation" and "use" elements of its DTSA and TUTSA claims.**

Arbor also argues that Vest cannot meet its burden on the second and third elements of its misappropriation claims, i.e., misappropriation and use.  *StoneCoat of Texas, LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 344 (E.D. Tex. 2019); *M-I L.L.C. v. Q'Max Sols., Inc.*, No. CV H-18-1099, 2019 WL 3565104, at *3 (S.D. Tex. Aug. 6, 2019). "Misappropriation" means the alleged trade secret was acquired through breach of a confidential relationship or by other improper means.  *Id.*  TUTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means."  TEX. CIV. PRAC. & REM. CODE § 134A.002.

Arbor argues that (1) Vest voluntarily disclosed the alleged trade secret information during the 2015 and 2017 demonstrations without requiring Arbor to sign any confidentiality agreement; and (2) Jocelyn Shelby purchased the right to download the MEQ from AST.  ECF 60 at 33-34.  Arbor's first argument ignores the evidence that Vest disclosed only a small sample of its MEQ during the demonstrations.  ECF 65-4 ¶ 24. Arbor's second argument ignores facts surrounding Jocelyn's purchase of the right to download the MEQ from AST.  Vest's summary judgment evidence demonstrates that Jocelyn Shelby used her personal gmail address (not her Arbor email address) to purchase "individual" access to online respirator medical screening from AST.  ECF 65-23; ECF 65-24.  In doing so, Jocelyn affirmatively accepted AST's terms and conditions and therefore agreed to use her access only for personal, non-commercial purposes and agreed not to

reprint, republish, modify, or distribute the material in any form without AST's express, written permission.  ECF 65-13 at 2-3; 65-14.  Arbor presents no authority holding that Vest cannot satisfy its burden to show "improper means" under these facts.  For purposes of summary judgment, the Court finds Vest has demonstrated a genuine issue of disputed fact as to whether Jocelyn improperly obtained access to Vest's MEQ through AST by representing she intended to use the MEQ only for her own personal use.  *See* ECF 65-27 (email from Jocelyn Shelby to Klavs Rudzitis telling him not to submit form on website because they would lose access).

As to the third element, Arbor does not deny, at least for purposes of summary judgment, using Vest's MEQ.  *See* ECF 60 at 34 ("Defendants did not use Plaintiff's website, marketing materials, computer software or algorithms. . . . Vest's MEQ is not a trade secret.").  In addition, Vest has presented evidence that Arbor sent material that had been downloaded from the AST website to Arbor's web-developer for use in creating Arbor's competing website.  ECF 65-24 - 65-27.

 The Court finds that Vest has satisfied its summary judgment burden as to the second and third elements of its misappropriation of trade secrets claims.

## IV.    Conclusion and Recommendation

For the reasons discussed above, the Court RECOMMENDS that Arbor's Motion for Summary Judgment (ECF 60) be GRANTED as to Vest's conspiracy and breach of contract claims, and DENIED as to Vest's CFAA, TUTSA, and DTSA claims.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections,

pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

 Signed on June 17, 2022, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge